UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

| | |
|---|---|
| GREGORY J. LEMOND,<br><br>Plaintiff,<br><br>v.<br><br>FREDERICK HAROLD STINCHFIELD<br>*a/k/a Frederick Harold Stinchfield, II*, and<br>FREDERICK HAROLD STINCHFIELD<br>*a/k/a Frederick Harold Stinchfield, III*,<br><br>Defendants. | Civil No. 17-2071 (JRT/TNL)<br><br><br><br>**MEMORANDUM OPINION AND<br>ORDER GRANTING MOTION FOR<br>PRELIMINARY INJUNCTION** |

_____

Karl C. Procaccini and Lawrence M. Shapiro, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for plaintiff.

Frederick Harold Stinchfield II and Frederick Harold Stinchfield III, 2255 Abingdon Way, Long Lake, MN 55356, *pro se* defendants.

Plaintiff Gregory J. LeMond brings this action against Defendants Frederick Harold Stinchfield, II, ("Stinchfield II") and Frederick Harold Stinchfield, III, ("Stinchfield III") (collectively, "Defendants"), alleging claims under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"). LeMond contends that sixty-six domain names, which Defendants registered and control, are identical or confusingly similar to LeMond's name or trademarks.

LeMond now moves for a preliminary injunction. Because the Court finds LeMond has established a likelihood of success on his ACPA claims, LeMond has shown a threat of irreparable harm, Defendants will suffer no harm in complying with the

preliminary injunction, and the public interest favors providing preliminary relief, the Court will grant LeMond's motion.

**BACKGROUND**

LeMond is a former professional cyclist and three-time winner of the Tour de France; he was "an early adopter and proponent of carbon fiber technology in cycling," (Decl. of Gregory J. LeMond ¶ 2, June 15, 2017, Docket No. 8). LeMond has used the LEMOND brand and trademark since at least 2004.[1] (*Id.* ¶¶ 4, 6.) In early 2016, LeMond founded two new companies – LeMond Companies, LLC and LeMond Composites, LLC – as part of a "venture focused on developing low-cost carbon fiber technology and producing and selling low-cost carbon fiber." (*Id.* ¶ 1.) The new companies market their carbon fiber products under the trademark GRAIL.[2] (*Id.* ¶¶ 5-6.) In late-August 2016, LeMond publicly announced some of his plans regarding his companies. (*Id.* ¶ 3.)

At issue are the following sixty-six domain names (the "Domain Names") containing LeMond's name or one of his marks:

---

[1] The U.S. Patent and Trademark Office Trademark Electronic Search System states that LeMond originally filed for a LEMOND trademark for use with bicycles, bicycle parts, and clothing, on July 8, 2004, LEMOND, Registration No. 3,137,558; then for use with exercise machines and exercise machine parts on February 22, 2013, LEMOND, Registration No. 4,664,298; and finally for use with carbon composite materials, on October 5, 2016, U.S. Trademark Application Serial No. 87/193,543 (filed Oct. 5, 2016).

[2] The Trademark Electronic Search System states that LeMond filed for the GRAIL trademark, to be used with sale of carbon composite materials, on October 3, 2016. U.S. Trademark Application Serial No. 87/191,754 (filed Oct. 3, 2016); U.S. Trademark Application Serial No. 87/191,760 (filed Oct. 3, 2016).

| | | | |
|---|---|---|---|
| 1) | grailadvantage.com | 34) | lemondaviation.net |
| 2) | grailadvantage.info | 35) | lemondcompanies.com |
| 3) | grailadvantage.net | 36) | lemondcompanies.us |
| 4) | grailadvantage.org | 37) | lemondcompaniesllc.com |
| 5) | grailaerospace.com | 38) | lemondcompaniesllc.info |
| 6) | grailautomotive.co | 39) | lemondcompaniesllc.net |
| 7) | grailautomotive.com | 40) | lemondcompaniesllc.org |
| 8) | grailcarbon.us | 41) | lemondcomposites.cc |
| 9) | grailcarbonfibercomposites.com | 42) | lemondcomposites.tech |
| 10) | grailcomposites.com | 43) | lemondcomposites.us |
| 11) | grailmethod.com | 44) | lemondexpose.com |
| 12) | grailrevolution.co | 45) | lemondgrail.com |
| 13) | grailrevolution.com | 46) | lemondhybrids.com |
| 14) | grailrevolutionaryfiber.com | 47) | lemondindustries.com |
| 15) | grailwindenergy.com | 48) | lemondindustries.info |
| 16) | grailwindenergy.info | 49) | lemondindustries.net |
| 17) | grailwindenergy.net | 50) | lemondindustries.org |
| 18) | grailwindenergy.org | 51) | lemondmanufacturing.com |
| 19) | greglemond.news | 52) | lemondmanufacturing.info |
| 20) | greglemondexposed.com | 53) | lemondmanufacturing.net |
| 21) | greglemondgonewild.com | 54) | lemondmanufacturing.org |
| 22) | lemond.company | 55) | lemondsolutions.com |
| 23) | lemond.mobi | 56) | lemondsolutions.info |
| 24) | lemond.news | 57) | lemondsolutions.net |
| 25) | lemond.tv | 58) | lemondsolutions.org |
| 26) | lemond.ws | 59) | lemondtechnologies.com |
| 27) | lemondalloys.com | 60) | lemondtechnologies.info |
| 28) | lemondautomotive.com | 61) | lemondtechnologies.net |
| 29) | lemondautomotive.info | 62) | lemondtechnologies.org |
| 30) | lemondautomotive.net | 63) | lemondwindenergy.com |
| 31) | lemondautomotive.org | 64) | lemondwindenergy.info |
| 32) | lemondaviation.com | 65) | lemondwindenergy.net |
| 33) | lemondaviation.info | 66) | lemondwindenergy.org |

(Decl. of Joseph B. Shapiro ("Shapiro Decl.") Ex. A, June 15, 2017, Docket No. 10.) Based on a review by a digital forensics consultant, all of these domain names are registered to "F H Stinchfield II," list Defendants' shared home address as the registrant's

address, and list Stinchfield III's email address – hal.stinchfield@gmail.com – as the registrant's email address. (*Id.* ¶¶ 1-4 & Ex. A.) All of the Domain Names were registered in September or October 2016. (*Id.*, Ex. A.) Several additional domain names registered to hal.stinchfield@gmail.com contain the name or registered mark of other well-known people, including Huma Abedin, Anthony Weiner, Rihanna, Leanne Rimes, and Wheelock Whitney. (*Id.* ¶ 4 & Ex. B.)

Until recently, one of the Domain Names (lemondindustries.com) hosted a website titled, "LeMond Industries," which consisted of blog posts containing "derogatory allegations about LeMond and his businesses." (Decl. of Kelly Harris ("Harris Decl.") ¶¶ 8, 10, 14, June 15, 2017, Docket No. 9.) The "LeMond Industries" site also contained pictures of LeMond and third-party advertisements. (*Id.* ¶¶ 8-9.) The website included approximately twenty-five blog posts made since June 2, 2017. (*Id.* ¶ 10.) One post, from June 8, 2017, was titled "LeMond-Related Domains for Sale!" and offered some of the Domain Names for sale with prices available "on inquiry." (*Id.* ¶ 11.) By the next day, this post was updated to add "Get these domains for cheap before they are sent to auction!" and to change the email address accepting price inquiries from "Sales@lemondindustries.com" to "BuyLeMondDomains@yahoo.com." (*Id.* ¶¶ 11-12.) In a post referencing the sale of domains dated June 10, 2017, the author stated that he or she hoped that "someone from the LeMond Composites team would reach out" and that

"[t]he amount of traffic driven by the URLS in the list runs in the 1000s per day with no original content."[3] (*Id.* ¶ 13.)

LeMond brought this ACPA action on June 15, 2017. (Compl., June 15, 2017, Docket No. 1.) LeMond seeks damages, forfeiture of the Domain Names, an injunction preventing Defendants from registering, using, or trafficking in the Domain Names or similar domain names, and attorney fees and costs. (*Id.* at 14.)

LeMond moved for a temporary restraining order and a preliminary injunction the day he filed the complaint. The Court held a status conference on the motion on June 21, 2017. The Court then granted in part LeMond's request for a temporary restraining order, preventing Defendants from transferring or selling the Domain Names and prohibiting Defendants from registering any additional domain names that incorporate or were confusingly similar to LeMond's name or marks. (Order, June 21, 2017, Docket No. 21.)

The Court held a hearing on LeMond's preliminary injunction motion on July 6, 2017, at which Defendants appeared *pro se*. Stinchfield II asserts that he had no involvement in the registration or use of the Domain Names. (Stinchfield II Answer, June 27, 2017, Docket No. 24.) Stinchfield III contends that other parties registered the

---

[3] Stinchfield III's Answer states this was a "sarcastic post" and that if a company representative had contacted him, he "would have simply given them the domain for free." (Stinchfield III Answer at 1, July 6, 2017, Docket No. 31.)

Domain Names,[4] (Stinchfield III Answer at 1, July 6, 2017, Docket No. 31), but he also admitted at the hearing that he had access to and control over the Domain Names and that he had posted on the "LeMond Industries" site.

**ANALYSIS**

**I.  STANDARD OF REVIEW**

In deciding whether to grant a preliminary injunction, the Court considers four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict . . . ; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

**II.  LIKELIHOOD OF SUCCESS ON THE MERITS**

LeMond contends that he is likely to succeed on the merits on his ACPA claims.[5] ACPA amended the Lanham Act, providing additional protection against

---

[4] Stinchfield III provided some documentary evidence at the hearing suggesting that the Domain Names were initially purchased by or in the name of LeMond's daughter, Simone LeMond.

[5] ACPA provides in relevant part:

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

(Footnote continued on next page.)

"cybersquatting" – defined as "registering or using with a bad faith intent to profit a domain name that is confusingly similar to a registered or unregistered mark or dilutive of a famous mark." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004) (citing 15 U.S.C. § 1125(d)). Congress enacted ACPA in part due to "concern about individuals registering domain names that are similar to famous marks for the purpose of profiting by selling them to the legitimate owners of the marks." *Id.* "ACPA was intended to balance the interests of trademark owners against the interests of those who would make fair uses of a mark online, such as for comment, criticism, parody, and news reporting." *Id.*

To determine if there was an ACPA violation, the Court must consider whether (1) the marks were distinctive or famous at the time of the registration of the Domain Names, (2) the Domain Names are identical or confusingly similar to the marks, (3) Defendants registered, trafficked, or used the Domain Names, and (4) Defendants did so with bad-faith intent to profit from the marks. 15 U.S.C. § 1125(d)(1)(A).

---

(Footnote continued.)

    (i)     has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

    (ii)    registers, traffics in, or uses a domain name that--

        (I)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to the mark;

        (II)   in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1125(d)(1)(A).

### A. Distinctive or Famous Marks

The first question is whether LeMond's marks were distinctive or famous at the time the Domain Names were registered. LeMond contends that at the time of the registration of the Domain Names both the LEMOND and GRAIL marks were already distinctive and the LEMOND mark was already famous.

The LEMOND mark, as a registered mark, is likely entitled to a rebuttable presumption that it is distinctive. *E.g., Faegre & Benson, LLP v. Purdy*, 447 F. Supp. 2d 1008, 1012 (D. Minn. 2006) (citing *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994)). Defendants have not rebutted this presumption, and the Court sees no reason not to apply it here. Accordingly, because the LEMOND mark was registered long before the Domain Names were registered, it was likely distinctive at the time the Domain Names were registered.

It appears that registration for the GRAIL mark was filed in October 2016, while some of the Domain Names were registered the month before, and thus, the presumption of distinctiveness likely does not apply. However, even without a presumption, LeMond could still establish that the GRAIL mark was distinctive at the time the Domain Names were registered "if it **either** (1) is inherently distinctive **or** (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

The first route "refers to inherent qualities of a mark," such that "[a] mark may be distinctive before it has been used." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 497 (2d Cir. 2000). Marks that are suggestive, arbitrary, or fanciful are

considered inherently distinctive "because their intrinsic nature serves to identify a particular source of a product." *Two Pesos*, 505 U.S. at 768. Suggestive marks are those that "require imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Frosty Treats Inc. v. Sony Comput. Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). A mark is considered "fanciful" if it is "a combination of letters or other symbols signifying nothing more than the product or service to which the mark has been assigned (*e.g.*, Exxon, Kodak)," while a mark is considered "arbitrary" if it "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached (*e.g.*, Camel cigarettes or Apple computers)." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). In contrast, descriptive marks – marks that "convey[] an 'immediate idea of the ingredients, qualities or characteristics of the goods'" – are protectable only upon a showing of secondary meaning. *Frosty Treats Inc.*, 426 F.3d at 1005 (quoting *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 785-86 (8th Cir. 1995)). Finally, generic marks – that is, marks "that refer[] to the common name or nature of an article" – are not protectable under trademark law. *Id.*

While GRAIL is an existing word, it does not refer to the "qualities or characteristics of the goods" or "to the common name or nature of an article." *Id.* Thus, based on the current information before the Court, the GRAIL mark, as used in relation to LeMond's carbon fiber business, is likely inherently distinctive as either suggestive or

arbitrary.⁶ *See Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 123 (D. Conn. 2002) (finding "the marks 'omega' and 'O', as used in connection with the manufacture and sale of watches, clocks, and electronic timing equipment, [we]re inherently distinctive" because "[t]he meanings associated with the word 'omega' and letter 'O' do not suggest time or watches" and thus the marks were "simply arbitrary designations for plaintiff's [products]").

Accordingly, the Court finds LEMOND and GRAIL were both likely distinctive marks at the time the Domain Names were registered.

### B. Identical or Confusingly Similar Domain Names

The Court must then consider whether the Domain Names are identical or confusingly similar to the LEMOND or GRAIL marks. "A domain name typically consists of a top level domain extension, such as .com, .org, or .net, and a second level domain name, such as pepsi in pepsi.com." *Coca-Cola Co.*, 382 F.3d at 783. "[C]ourts generally look to the second level domain name to determine whether it is identical or confusingly similar to a given mark." *Id.* at 783-84.

Some of the Domain Names are identical to the LEMOND mark (e.g., lemond.company and lemond.mobi). Similarly, the Domain Name lemondgrail.com

---

⁶LeMond does not specifically argue that GRAIL is inherently distinctive on this basis; instead, he argues that GRAIL is protected due to its secondary meaning related to LeMond's carbon fiber products. However, secondary meaning requires a showing that the mark has actually obtained secondary meaning with the public, which is a showing LeMond does not attempt to make. *See, e.g., Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 438-39 (W.D.N.Y. 2008) (discussing the factors for determining secondary meaning).

merely combines LeMond's two marks and the Domain Name greglemond.news merely adds LeMond's first name to the mark, and thus, they are identical or confusingly similar to the marks. Many Domain Names combine LeMond's marks with words related to LeMond's business or generic words (e.g., grailcarbon.us, lemondcomposites.cc, lemondcompanies.com, lemondwindenergy.com). But, the addition of generic terms, particularly those relevant to the mark, does not prevent a finding that a domain name is confusingly similar to a mark. *Id.* at 784 (finding "my-washingtonpost.com, mymcdonalds.com or drinkcoke.org" confusingly similar to the Washington Post, Coke, and McDonald's marks).

Additional factors also suggest a likelihood of confusion. The timing of the registration – the fact that the Domain Names were registered within months of LeMond's announcement of his carbon fiber business – is evidence of likelihood of confusion. *Webadviso v. Bank of Am. Corp.*, No. 09-5769, 2009 WL 5177997, at *4 (S.D.N.Y. Dec. 31, 2009) (finding the timing of the domain names' registration on the day a merger was announced "surely created confusion"). Also, in *Coca-Cola Co.*, the court found a likelihood of confusion in part because the defendant "intended to capitalize on the similarity between his domain names and plaintiffs' marks . . . and intentional infringers are likely to succeed in creating confusion." 382 F.3d at 784. Here, there is some evidence that Defendants intended to create confusion, considering the number of Domain Names registered containing the marks, the post offering some of the Domain Names for sale, and the post stating that the Domain Names received "1000s [of

views] per day with no original content," (Harris Decl. ¶ 13), which would also suggest actual confusion.

Overall, the Court finds LeMond will likely be able to show a likelihood of confusion between the Domain Names and his marks.

### C. Registered, Trafficked, or Used the Domain Names

The next question is whether Defendants registered, trafficked, or used the Domain Names. Stinchfield II stated that he had no involvement with the Domain Names, and Stinchfield III asserted that other individuals were involved in registering the Domain Names. However, there is evidence connecting Defendants to the Domain Names: they were registered in Stinchfield II's name, with the Stinchfields' shared address, and with Stinchfield III's email address. Additionally, Stinchfield III admitted to having control over the Domain Names and to posting on the "LeMond Industries" site. There is also evidence of Stinchfield III's trafficking in many of the Domain Names based on the post on the "LeMond Industries" site offering them for sale. The Court notes that the Defendants' conduct and the possible involvement of other individuals remain somewhat unclear, and additional defendants may eventually need to be added. But the Court finds sufficient evidence at this stage in the proceedings to support a likelihood of success on this element.

### D. Bad Faith Intent to Profit from Marks

Finally, the Court must consider whether there was bad faith intent to profit from the marks. ACPA provides a list of non-exclusive factors for courts to consider in

determining whether there is bad faith intent. 15 U.S.C. § 1125(d)(1)(B)(i). "The first four factors have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark, and the other five are indicia of bad faith intent." *Coca-Cola Co.*, 382 F.3d at 785.

The first three factors do not weigh in Defendants' favor: Defendants do not have any "trademark or other intellectual property rights" in the Domain Names; the Domain Names do not include Defendants' legal name or a name used to identify them; and Defendants have not used the Domain Names in connection with any "bona fide offering of . . . goods or services." 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(III).

The fourth factor – "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name," 15 U.S.C. § 1125(d)(1)(B)(i)(IV) – also does not clearly weigh in Defendants' favor. Defendants could argue that the "LeMond Industries" site was a criticism or "gripe site," which may be considered a noncommercial, fair use of LeMond's marks. *See Cleary Bldg. Corp. v. David A. Dame, Inc.*, 674 F. Supp. 2d 1257, 1265 (D. Colo. 2009). However, that site represents only one of the sixty-six registered Domain Names containing LeMond's marks, and thus, the notion that just one site may be a "gripe site" does not explain Defendants' conduct. Additionally, the fact that a site contains a noncommercial or fair use of the marks does not prevent a finding of bad faith. *Coca-Cola Co.*, 382 F.3d at 778 ("To recognize such an exemption would 'eviscerate the protections of the bill by suggesting a blueprint for cybersquatters who would simply create criticism sites in order to immunize themselves

from liability despite their bad-faith intentions.'" (quoting S. Rep. No. 106-140, at *9 (1999))).

The fifth factor may weigh in favor of a finding of bad intent because one could find that the "LeMond Industries" site was "inten[ded] to divert consumers from [LeMond's] online location" to the "LeMond Industries" site. 15 U.S.C. § 1125(d)(1)(B)(i)(V). That site contained advertisements, as well as the post seeking to sell some of the Domain Names, meaning the diversion may have been "for commercial gain." *Id.* Moreover, the timing of the Domain Names' registration (after the announcement of LeMond's carbon fiber business), the combination of the marks with other terms related to LeMond's business, and the content of the "LeMond Industries" site (containing images and postings related to LeMond and his businesses) clearly demonstrate that Defendants knew about LeMond and his marks at the time the Domain Names were registered.

The sixth factor also weighs in favor of a finding of bad faith because the post on the "LeMond Industries" site offering to sell many of the Domain Names (while those Domain Names were unused) likely counts as an "offer to transfer, sell, or otherwise assign the domain name[s] to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name[s]." 15 U.S.C. § 1125(d)(1)(B)(i)(VI).

The seventh factor is not implicated at this time because it is not clear that "material and misleading false contact information" was used when applying to register

the Domain Names or that Defendants "intentional[ly] fail[ed] to maintain accurate contact information." 15 U.S.C. § 1125(d)(1)(B)(i)(VII).

The eighth factor weighs in favor of finding bad faith because Defendants registered sixty-six domain names related to the LEMOND and GRAIL marks. 15 U.S.C. § 1125(d)(1)(B)(i)(VIII) (directing courts to consider "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others"). Additionally, there is evidence that Defendants registered domain names related to other famous marks or names at the same time, as discussed above. *See Bulbs 4 E. Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1170 (S.D. Tex. 2016) ("[T]he fact that [the defendant] has offered other domain names for sale . . . suggests bad faith."); *Web-adviso v. Trump*, 927 F. Supp. 2d 32, 45 (E.D.N.Y. 2013) ("Plaintiff's bad faith is further demonstrated by the fact that he owns almost two hundred domain names, many of which are obvious appropriations [of] well-known brands."), *aff'd sub nom. Yung v. Trump*, 648 F. App'x 24 (2d Cir. 2016).

Finally, the ninth factor weighs in favor of a finding of bad faith because the LEMOND mark is likely distinctive and famous and the GRAIL mark is likely distinctive. 15 U.S.C. § 1125(d)(1)(B)(i)(IX).

Overall, the Court finds LeMond has established a likelihood of success on the merits of his ACPA claim.[7]

---

[7] For the same reasons that LeMond is likely to succeed on the merits on his 15 U.S.C. § 1125(d) claim (which covers LeMond's marks), the Court finds LeMond is also likely to succeed on his claim under 15 U.S.C. § 8131 (which covers personal names). *See Randazza v.*

(Footnote continued on next page.)

## III. IRREPARABLE HARM

"Courts generally presume irreparable injury once a plaintiff in a trademark action has established that it is likely to succeed on the merits." *Randazza v. Cox*, 920 F. Supp. 2d 1151, 1158 (D. Nev. 2013) (citing *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007)); *see also Webadviso*, 2009 WL 5177997, at *3; *Vogster Entm't, LLC v. Mostovoy*, No. 09-1036, 2009 WL 691215, at *6 (E.D.N.Y. 2009); *Verizon Cal. Inc. v. Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1097 (N.D. Cal. 2008). Additionally, there is some evidence of a threat of irreparable harm, including likelihood of customer confusion and loss of good will for LeMond's marks. *See Webadviso*, 2009 WL 5177997, at *4 (finding a likelihood of irreparable harm because consumers may arrive at the defendants' websites when seeking information about the plaintiffs and because the plaintiffs "may want to use the domain names for bona fide business matters"); *see also Bogoni v. Gomez*, 840 F. Supp. 2d 694, 701-02 (S.D.N.Y. 2011) (finding irreparable harm, noting "the mere fact that both Domain Names are spelled **only** with the plaintiff's name weighs quite heavily in favor of the plaintiff . . . ; any time the plaintiff meets a new person, that person – or, for that matter, anyone the plaintiff already knows – will be just clicks away from visiting one of the sites

---

(Footnote continued.)

*Cox*, 920 F. Supp. 2d 1151, 1157 (D. Nev. 2013) (considering the same factors for a § 8131 claim as for a § 1125(d) claim "because the statutes [are] 'so strikingly similar'" (quoting *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 524 (S.D.N.Y. 2012))).

run by the defendant"). The Court therefore finds that LeMond has established a likelihood of irreparable harm sufficient to support a preliminary injunction.

## IV. BALANCE OF HARMS

Defendants have admitted that they have no interest in maintaining ownership over the Domain Names and that they are willing to transfer whatever ownership interest they have over the Domain Names to LeMond. Thus, the Court finds that any harm Defendants would suffer in complying with the preliminary injunction is minimal and would be outweighed by the irreparable harm LeMond would suffer without an injunction.

## V. PUBLIC INTEREST

The Court finds that the public interest favors an injunction in this case, due to the risk of public deception and broader public interests implicated by cybersquatting. *See Coca-Cola Co.*, 382 F.3d at 789-90 ("The danger of consumer deception warrants some regulation of trademark usage and the public interest in free expression is adequately protected by leaving open ample alternative avenues of communication." (internal citation omitted)).

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Court's prior order regarding LeMond's request for a temporary restraining order [Docket No. 21] is **RESCINDED**.

2. LeMond's Motion for a Preliminary Injunction [Docket No. 5] is **GRANTED**, as follows:

**UNTIL FURTHER ORDER OF THIS COURT**, a preliminary injunction is hereby entered against Defendants as follows:

(1) Defendants, their agents, representatives, and employees, and all persons acting in concert or participation with Defendants, must remove all content from, and cease all use of any of the Domain Names and any other domain names in Defendants' possession, custody, or control that are identical or confusingly similar to the names Greg LeMond or Gregory LeMond or the LEMOND or GRAIL trademarks.

(2) Defendants, their agents, representatives, and employees, and all persons acting in concert or participation with Defendants are hereby enjoined from selling or transferring to anyone other than Gregory J. LeMond any of the Domain Names and any other domain names in Defendants' possession, custody, or control that are identical or confusingly similar to the names Greg LeMond or Gregory LeMond or the LEMOND or GRAIL trademarks.

(3) Defendants, their agents, representatives, and employees, and all persons acting in concert or participation with Defendants must immediately forfeit and transfer to LeMond the Domain Names and any other domain names in Defendants' possession, custody, or control that are identical or

confusingly similar to the names Greg LeMond or Gregory LeMond or the LEMOND or GRAIL trademarks.

(4)     Defendants, their agents, representatives, and employees, and all persons acting in concert or participation with Defendants are hereby enjoined from registering any additional domain names that are identical or confusingly similar to the names Greg LeMond or Gregory LeMond or the LEMOND or GRAIL trademarks.

This Order is effective upon the date recited below, and shall remain in effect until further Order of this Court, provided that within 10 days of the date of this Order, LeMond posts a bond with the Clerk of this Court, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, in the sum of Five Hundred Dollars ($500.00).

3.      The Clerk of Court is **DIRECTED** to enter judgment on plaintiff's Motion for a Preliminary Injunction [Docket No. 5].

DATED: August 14, 2017　　　　　　_____s/John R. Tunheim_____
at Minneapolis, Minnesota.　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　United States District Court